UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
RUDOLPH KORNMANN,                                           :
                                                            :
                    Plaintiff,                    :
                                                            :     **MEMORANDUM DECISION**
         - against -                          :     **AND ORDER**
                                                            :
THE CITY OF NEW YORK BUSINESS                               :     17-cv-2328 (BMC)
INTEGRITY COMMISSION,                                       :
                                                            :
                    Defendant.                    :
                                                            :
----------------------------------------------------------- X

**COGAN**, District Judge.

    Plaintiff brought this employment discrimination action alleging that his employer denied him an accommodation for his disability, retaliated against him for complaining, and then constructively discharged him. His claims arose under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*; the New York State Human Rights Law, N.Y. Exec. Law § 296 *et seq.*; and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 *et seq.* ("NYCHRL"). Following a trial, a jury found his former employer and defendant, the New York City Business Integrity Commission ("BIC"), liable under the NYCHRL in the amount of $1.00 in nominal damages for failing to provide plaintiff with a reasonable accommodation for his disability.

    This is a case that should never have been brought. Although plaintiff had plenty of excuses, there was no real dispute that he had enormous difficulties getting along with almost all his supervisors as well as some of his co-workers for reasons that were at most tangentially related to his disability. More importantly, the delta between plaintiff's requested accommodation and the accommodation that BIC actually provided was so narrow that, although the jury found that BIC should have, or at least could have, gone the extra 1% to accommodate

plaintiff, it also found that the technical violation did not damage plaintiff, and it therefore awarded only nominal damages. The jury acted within its purview in making this finding, and therefore defendant's Rule 50 motion is denied.

As to plaintiff's request for attorneys' fees, his status as a "prevailing party" is in name only. Plaintiff could not prove that he was meaningfully affected by defendant's decision to implement its reasonable accommodation over the one plaintiff wanted. This case has wasted the time and resources of the parties, the Court, and the jury. Accordingly, plaintiff's motion for attorneys' fees is denied.

## BACKGROUND

### I. Summary of case

BIC is a New York City agency charged with investigating organized crime and other corruption in the commercial waste disposal industry and the City's public wholesale markets. Plaintiff became a director of computer programming at BIC in 2001, having transferred there from another City agency at which he had worked since 1983. One year after he started at BIC, plaintiff was demoted to the position of computer programmer. He continued in that position until his separation in 2016 that gave rise to this lawsuit.

Plaintiff suffers from chondromalacia, a condition that erodes cartilage between the joints. His disability claim was that he needed a "flex schedule" at work because his knee pain made it difficult to come to work on the subway during rush hour, and he needed some mornings to vary his time in case there was soreness. He demanded a schedule that would allow him to arrive between 9:30 a.m. and 10:30 a.m., as he chose. In fact, that was similar to the schedule that he and other BIC employees had until sometime between 2007 and 2008, when defendant

abandoned its flex-time schedule for all employees. That was the catalyst that led to the problem between him and defendant.

## II. Procedural History

Plaintiff brought this case *pro se* in April 2017. He proceeded *pro se* until January 2018, at which time he retained attorney Shahab Dean Ghalambor. It is usually the case that the appearance of counsel in a *pro se* case is advantageous not only to the plaintiff but to the Court and defense counsel. Not so here.

Attorney Ghalambor moved to be relieved as counsel within three weeks of his appearance. He explained to the Magistrate Judge that he had accepted a position as a New York City Assistant Corporation counsel on the same day that plaintiff retained him, and that the City had advised him that it would be a conflict of interest to continue representing plaintiff in this case. The Magistrate Judge was troubled by Attorney Ghalambor's simultaneous acceptance of plaintiff's retainer and the ACC position, particularly because Attorney Ghalambor had not perceived the obvious conflict until after the City pointed it out to him. Nevertheless, the Magistrate Judge agreed to grant Attorney Ghalambor's motion to withdraw if he returned any money received from plaintiff. Attorney Ghalambor demurred, suggesting that it was only a conflict because the City perceived it as a conflict, and asked to retain at least a portion of the retainer. The Magistrate Judge was not persuaded:

> I don't see how this helps Mr. Kornmann. I am going to grant your motion to be relieved on the condition that you refund all the monies that he's paid to you. You took on a representation that you almost immediately became conflicted out of. I don't understand how knowing that you couldn't continue the representation, you can ethically continue to bill the man.

For reasons that the docket does not disclose, the conflict was apparently eliminated, and Attorney Ghalambor reappeared as counsel for plaintiff three months later.

3

The case did not proceed in an orderly fashion. Most of the filings that Attorney Ghalambor made were requests for extensions of time. Attorney Ghalambor filed an amended complaint, but it was woefully deficient. The Court granted defendant's motion to dismiss it, but gave Attorney Ghalambor leave to file a second amended complaint. In doing so, the Court stated:

> This will likely be his final opportunity to state a non-conclusory claim. Plaintiff should drop the hyperbole, argument, conclusory allegations, and characterizations of defendant's actions and describe what happened and when it happened. The boilerplate adjectives leave no favorable impression with the Court and are not going to the jury, so there is no reason to include them.

The case struggled through discovery (which was not entirely the fault of plaintiff's counsel), and the final pretrial conference, with multiple disputes and multiple extensions of deadlines. Although I will not describe in detail the tortuous task of getting this case ready for trial, it suffices to note that the Court was compelled to impose a substantial sanction on Attorney Ghalambor based on its finding that he had offered a wholly fictional excuse to the Court to justify one of his many requests for extensions of time.

The case finally came on for trial before a jury from September 27, 2021, through October 1, 2021. Shortly before trial, an additional attorney, Joseph James Ranni, appeared for plaintiff and handled most or all of the trial.

### III. Plaintiff's Case

Plaintiff was the only witness in his case. He outlined his career as an employee with defendant and explained that in the early 2000s, he began to suffer from chondromalacia. Plaintiff testified that he requested permission to walk around the office, stand at his desk to stretch, and take time to visit a physical therapist. All of these requested accommodations were granted.

4

Plaintiff then testified that between 2007 and 2008, defendant eliminated its flex-time policy (allowing employees to start within a band of time, in plaintiff's case between 9:30 a.m. and 10:30 a.m.). Plaintiff described how he requested to keep his flex-time as an accommodation for his disability, and that request was denied. Plaintiff testified that he needed the flex-time because not being able to alternate between sitting and standing on public transportation or take his time walking up and down stairs could cause him pain. Plaintiff acknowledged, however, that defendant granted him a later start time of 10:00 a.m., and, in 2014, offered an 8:00 a.m. to 10:00 a.m. flex-time start with a five-minute grace period. But plaintiff believed this was insufficient to accommodate his disability. From 2008 through 2015, plaintiff repeatedly asked for an extra 30 minutes, along with supporting medical records.

Plaintiff testified that when he began to request flex-time, he was repeatedly docked pay for being late and improperly taking sick leave. He added that his sporadic and unexpected absences, as well as some of his disparaging statements about other colleagues at work (for example, calling a supervisor "dumb" to a co-worker), frustrated his supervisors, who would regularly reprimand him and monitor his arrival and departure times. In response, plaintiff filed at least one complaint with the Equal Employment Opportunity Commission and submitted medical records and complaints to defendant's personnel department.

During one argument with a supervisor in 2013 about taking work breaks, plaintiff testified he was told to sit down and stay at his desk. Plaintiff recalled disobeying that directive, getting yelled at, and then being suspended for three months – the first without pay and the latter two with pay. Plaintiff testified that defendant did this because it wrongly believed plaintiff was the aggressor in the exchange with his supervisor and that plaintiff had instigated an incident

constituting "workplace violence." Plaintiff claimed he never had a chance to articulate his version of events or remind human resources representatives of his disability.

Once he returned to work from suspension in 2013, plaintiff testified that he complained to his Union about his mistreatment and repeatedly requested a 9:30 a.m. to 10:30 a.m. flex-time start (instead of a 10:00 a.m. start with a five minute grace period). Plaintiff also testified that around this time, defendant had started to change its computer systems. Matthew Gonzalez, his direct supervisor who was responsible for implementing this shift, did not invite him to any meetings or tell him what was going on with the project. Plaintiff also testified that he was denied any training on the system or access to the outside contractors that Mr. Gonzalez hired as part of the project. Plaintiff testified that he still regularly operated and loaded data into defendant's legacy computer systems, with which he was familiar.

Plaintiff acknowledged that his lateness, absence, and general dislike of the new computer system led to confrontations with coworkers and supervisors. These took the form of tense informal workplace conversations, as well as formal written reprimands from plaintiff's supervisors and repeated meetings involving plaintiff, his supervisors, and defendant's personnel department.

Plaintiff testified that most of these confrontations related to plaintiff's improper use of sick days and his violations of defendant's lateness policy. Plaintiff added that when he was reprimanded for these transgressions, defendant improperly applied its disciplinary policy. Plaintiff testified that his supervisors skipped certain required discipline steps or backdated other meetings to make it appear like they were adhering to defendant's policies.

He also testified that in 2015, he received a very harsh performance review. This review primarily focused on issues beyond plaintiff's work product, including his timeliness, use of sick

leave, and combative attitude. Included in this report was also a recommendation that plaintiff not receive additional training because the reviewer believed plaintiff would be unreceptive.

Finally, in the late fall of 2015, plaintiff had an unannounced absence of five to ten days to get a medical procedure and attend his mother's funeral. Plaintiff testified that the day he returned, his supervisor, Michael Del Pino, reprimanded him for not informing Mr. Del Pino of the sick leave and grieving period he took, and, in light of that, directed plaintiff to start arriving at 9:00 a.m. Mr. Del Pino also denied another one of plaintiff's flex-time accommodation requests. Plaintiff testified that in this meeting, his supervisor told him to "man up." Plaintiff testified that he was so angry that he made a threat to file an EEOC complaint and take legal action.

Four days after that meeting, plaintiff testified he found out he was being investigated for making a threat during the meeting. The alleged threat referred to an AK-47 assault rifle. Plaintiff learned that he was going to be the subject of termination proceedings based on that and/or his workplace behavior. Plaintiff testified that he did not know what an AK-47 rifle was and never made that statement. Plaintiff testified that he was suspended without pay, escorted from the building, and forced to surrender his credentials. Shortly after he was suspended, defendant initiated termination proceedings.

Instead of proceeding with the termination process, plaintiff testified that he submitted his resignation and filed another administrative charge of disability discrimination and retaliation with the EEOC. As a result of his decision to retire, plaintiff stated that he lost an annual salary of $70,000 a year and a range of other benefits like health care and New York City employee discounts.

## IV. Defendant's Case

John Curry, Michael Del Pino, and Matthew Gonzalez testified for defendant. They all testified that plaintiff regularly came in late, distracted other employees from their work, turned in poor work product, was the subject of several coworker complaints, and routinely violated defendant's sick leave policy. These witnesses also testified that plaintiff's behavior prompted defendant to take administrative actions designed to ameliorate these problems.

Mr. Curry was an investigator for defendant who doubled as its disciplinary advocate. In that role, Mr. Curry had the power to discipline and suspend employees. It was in that role that Mr. Curry interacted with plaintiff and reviewed his personnel file. Mr. Curry testified that plaintiff's file was filled with incidents demonstrating his unprofessionalism and showing that he was repeatedly reprimanded for his poor behavior. These incidents included backdating timecards, showing up late to work, ignoring or openly challenging instructions of supervisors, and, in one instance, making a joke about bio-terrorism to a colleague. This testimony showed that for most of his career, plaintiff was regularly the subject of discipline for his workplace conduct and confrontational behavior. Mr. Curry also testified that plaintiff's supervisors instructed plaintiff to not disrupt other employees. They also instructed him that when he went on his walks around the office, he had to adhere to the office policy of two twenty-minute breaks because the walkabouts were so disruptive to other employees.

Finally, Mr. Curry testified that he suspended plaintiff on two occasions. The first was in 2013 when plaintiff was charged with insubordination as part of an altercation where plaintiff verbally assaulted his supervisor and made aggressive hand gestures. The second was in 2015 after Mr. Curry learned that plaintiff told his supervisor that, although he would not do this, his

friends thought he should come to work with an AK-47.  Mr. Curry testified that when he interviewed plaintiff, plaintiff admitted he made the AK-47 remark. Following that interview, Mr. Curry suspended plaintiff and initiated termination proceedings against him.

      Michael Del Pino, the director of plaintiff's unit, and Michael Gonzalez, the associate director, confirmed Mr. Curry's description of events leading up to plaintiff's resignation and added further context to plaintiff's office behavior.  This included testimony demonstrating plaintiff's repeated lateness, abuse of sick time policies, confrontational attitude, and failure to understand or demonstrate an independent desire to learn defendant's newer computer programs.  Both witnesses also discussed their need to hire independent contractors because plaintiff could not use the new systems.

      Mr. Del Pino testified that he decided to give plaintiff a strict 9:00 a.m. start in 2015.  He did this after learning that plaintiff would walk around the office and distract other employees after Mr. Del Pino and Mr. Gonzalez would leave at 5:00 p.m.  Mr. Del Pino said he repeatedly told plaintiff that he could not do this, but plaintiff did not listen.  Despite all these problems, and a desire to exercise more control over plaintiff's behavior, both managers testified that neither intended to terminate plaintiff in 2015.

      Because Mr. Del Pino was plaintiff's senior manager, he informed plaintiff privately of his start time change.  Mr. Del Pino recalled that during this conversation plaintiff got very frustrated and screamed at him.  Mr. Del Pino also testified that the meeting with plaintiff lasted about an hour, he never told plaintiff to "man up," or heard plaintiff threaten to file a grievance.  He recalled, however, that plaintiff stated: "I would never do this, but, you know, my friends tell me that they don't understand how I don't come up here and just – you know, with an AK-47 and shoot this place up."

9

Mr. Del Pino testified that this last comment didn't strike him as out of line with plaintiff's normal, weird behavior, so he didn't think much of it. But when Mr. Del Pino repeated plaintiff's statement to Cindy Haskins, the head of BIC's Human Resources department, Ms. Haskins became highly concerned. Hearing her perspective about the danger of workplace violence, Mr. Del Pino realized he should not have taken plaintiff's comment lightly.

## V.  Verdict

The jury took only a few hours to reach a verdict. It rejected all of plaintiff's various disability, failure to accommodate, and retaliation claims, except for one claim for failure to accommodate under the more liberal standard of the NYCHRL. It found that plaintiff had failed to prove any compensatory damages and awarded him nominal damages of $1.00.

## DISCUSSION

## I.  Fed. R. Civ. P. 50(b)

Rule 50 enables the district court to enter judgment as a matter of law against a party on an issue only if there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, and permits the district court to do so after a jury verdict. See Nadel v. Isaksson, 321 F.3d 266, 271-72 (2d Cir. 2003). When considering the evidence associated with a Rule 50(b) motion, the court may not "weigh evidence, assess credibility, or substitute its opinion of the facts for that of the jury", Vermont Plastics, Inc. v. Brine, Inc., 79 F.3d 272, 277 (2d Cir. 1996), and may grant the motion only when there is "either an utter lack of evidence supporting the verdict, so that the jury's findings could only have resulted from pure guess-work, or the evidence [is] so overwhelming that reasonable and fair-minded persons could only have reached the opposite result," Doctor's Assocs., Inc. v. Weible, 92 F.3d 108, 112 (2d Cir. 1996) (internal quotation marks omitted).

10

Defendant seeks a Rule 50(b) judgment as a matter of law on two grounds: first, plaintiff failed to establish a nexus between his chondromalacia and his requested "reasonable accommodation" of a "flex-time" start between 9:30 a.m. and 10:30 a.m.; and, second, even with this accommodation, plaintiff failed to demonstrate that he could perform the essential functions of his job. Defendant's theories are supported by a mountain of evidence, but there was sufficient contrary evidence for a reasonable jury to find otherwise.

During trial, the parties stipulated before the jury that plaintiff had a qualifying disability. Nor was there any issue of defendant's knowledge of his disability – the numerous complaints, human resources meetings, and defendant's accommodations (such as a footstool and ergonomic chair), demonstrate that defendant knew. That left only the issue of the nexus between plaintiff's disability and the requested accommodation. On this point, plaintiff's direct testimony – that the pace of the morning rush hour prevented him from resting and caused him pain – was enough, albeit barely, for a jury to find a nexus existed.

Under the NYCHRL, defendant has "the burden . . . to show the unavailability of any safe and reasonable accommodation [requested by the plaintiff] and [has] to show that any proposed accommodation would place an undue hardship on its business." Jacobsen v. New York City Health & Hosps. Corp., 22 N.Y.3d 824, 833, 988 N.Y.S.2d 86, 93 (2014). The NYCHRL explicitly states that an employer has an affirmative obligation to provide a reasonable accommodation when "the disability is known or should have been known by the [employer]." N.Y.C. Admin. Code § 8-107(15)(a).

The 10:00 a.m. start time, with a five minute grace period, allowed plaintiff to avoid rush hour traffic and gave him sufficient time to get to work given his 30-to-40-minute commute.

11

Additionally, plaintiff conceded on cross-examination that if he had wanted to, he could have structured his morning to ensure that he almost never missed a 10:00 a.m. start or the 8:00 a.m. to 10:00 a.m. flex-time window.

The issue of whether the difference in the "bid and asked" presented a jury question is close. There was no dispute that defendant moved plaintiff to a 9:00 a.m. start time only when he repeatedly failed to make the 10:00 a.m. (plus five minute grace period) start time and engaged in other workplace disruptions. The jury was asked to determine whether the 10:05 a.m. arrival time was an adequate accommodation for plaintiff's disability. That is a 25-minute difference. A jury could easily have found that this was too minor to constitute a failure to accommodate. Indeed, that is what it found with respect to plaintiff's federal and state disability claims.

As noted above, however, the NYCHRL is different. It places the burden on defendant to show why plaintiff's requested accommodation is unreasonable or would cause undue hardship. See Jacobsen, 22 N.Y.3d at 833, 988 N.Y.S.2d at 93.

Under that standard, it was not a manifestly unreasonable determination for the jury to conclude that the 25 minutes mattered. In essence, the jury concluded that having allowed plaintiff an arrival time of 10:05 a.m., there was no reason defendant couldn't have gone the extra mile and given him until 10:30 a.m. It might not have been the verdict that this Court would reach had it been acting as factfinder, but it does not meet the standard for overturning a verdict.

Defendant's second argument, that plaintiff could not perform the essential functions of his job, is also supported by substantial evidence. Plaintiff's exceptionally poor work product, inability to operate defendant's new computer system, distraction of other employees, and

combative behavior, all point to defendant being incapable of performing the tasks required of a computer programmer.

But a reasonable jury could still reach the opposite conclusion, considering that plaintiff had worked for defendant for over 15 years, that he was responsible for several of defendant's legacy computer systems, and Mr. Del Pino testified that he did not originally contemplate terminating plaintiff in 2015. Again, this might not have been the verdict that this Court would have reached had it been acting as factfinder, but there is just barely enough evidence to bring the jury's verdict within the allowable range of fact-finding.

## II.   Attorney's Fees

Because defendant was found liable under the NYCHRL, the relevant section for attorney's fees is N.Y.C. Admin. Code § 8-502(g). This provides: "In any civil action commenced pursuant to [Chapter 5, entitled "Civil Action By Persons Aggrieved by Unlawful Discriminatory Practices"], the court, in its discretion, may award the prevailing party reasonable attorney's fees, expert fees and other costs." N.Y.C. Admin. Code § 8-502(g). This provision must be considered in conjunction with N.Y.C. Admin. Code § 8-130(a). That section states: "The provisions of this title shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York state civil and human rights laws, including those laws with provisions worded comparably to provisions of this title, have been so construed." Id.

Nothing in the language of these provisions, however, requires a court to grant attorneys' fees to a prevailing party. When the Court of Appeals considered these provisions in Albunio v. City of New York, 23 N.Y.3d 65, 73, 989 N.Y.S.2d 1 (2014), it held that "[f]ederal case law [is not binding but] can provide useful guidance [for interpreting the policy behind the NYCHRL's

attorney's fee provisions] . . . since [these provisions are] similar to the fee provisions in the federal civil rights statutes." (Internal quotation marks and citation omitted).  Nothing in § 8-130(a)'s guidance conflicts with § 8-502(g)'s instruction that courts, "in [their] discretion, may award the prevailing party reasonable attorney's fees."

Given the nature of the case here, the federal framework for when to grant attorneys' fees outlined in Hensley v Eckerhart, 461 U.S. 424, 433 (1983), and Pino v. Locascio, 101 F.3d 235, 239 (2d Cir. 1996) ("attorney's fees and costs are usually not appropriate when a plaintiff recovers only nominal damages", (citing Farrar v. Hobby, 506 U.S. 103, 113-15 (1992)), provides guidance.  Under this line of cases, determining whether an award of attorney's fees is appropriate requires a two-step inquiry.  First, the party must be a "prevailing party." See Farrar, 506 U.S. at 109.  If he is, then the requested fee must also be reasonable.  Hensley v. Eckerhart, 461 U.S. 424, 433 (1983).  The most important factor in determining the reasonableness of a fee is the degree of success obtained.  See Farrar, 506 U.S. at 114.

The verdict here demonstrates that plaintiff technically "prevailed," but the victory was pyrrhic.  See generally, id. at 115 ("in some circumstances, even a plaintiff who formally 'prevails' . . . should receive no attorney's fees at all.  A plaintiff who seeks compensatory damages but receives no more than nominal damages is often such a prevailing party.").  Out of the nine claims brought by plaintiff, the jury found defendant only nominally liable for one.  It found defendant did not discriminate or retaliate against plaintiff.  Additionally, when the law placed the burden on plaintiff to show that a flex-time accommodation was reasonable, the jury again found in favor of defendant.

It was only when defendant, under the NYCHRL, had to rebut the presumption that a request for flex-time was reasonable that the jury found defendant liable for $1.00 of nominal

damages. This nominal award was granted by the jury after plaintiff told them he was seeking approximately $150,000 in lost wages and approximately $130,000 in lost pension benefits.

The jury awarded these nominal damages because plaintiff failed to prove an essential element of his claim for compensatory relief – that he was actually injured when defendant denied his requested accommodation and, instead, required him to come in 25 minutes earlier. See id. at 115 ("when a plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim for monetary relief . . . the only reasonable fee is usually no fee at all."); Pino, 101 F.3d at 238 ("fee awards are not appropriate where, having failed to capture compensatory or punitive damages, a plaintiff wins only 'the moral satisfaction of knowing that a federal court concluded that [their] rights had been violated.'" (quoting Farrar, 506 U.S. at 114)).

"[T]he broad and remedial purposes" of § 8-130(A) – to protect individuals with disabilities who are actually injured by their employer's failure to reasonably accommodate their needs – were not served by bringing this action or the verdict received. Thus, declining to award attorneys' fees and costs falls squarely within the guidance provided by § 8-130(a) and § 8-502(g), as well as federal law.

## CONCLUSION

Plaintiff's motion for attorneys' fees and costs [138] [143] and defendant's Rule 50(b) motion [130] are both DENIED.

**SO ORDERED.**

Digitally signed by Brian M. Cogan
U.S.D.J.

Dated: Brooklyn, New York
September 7, 2022